USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-24-15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **A.A., individually, on behalf of, and as parent of J.A., a student with a disability,** | X | |
| **Plaintiff,** | : | **14 Civ. 8483 (ALC)** |
| **-against-** | : | |
| **NEW YORK CITY DEPARTMENT OF EDUCATION,** | : | **MEMORANDUM AND ORDER** |
| **Defendant.** | X | |

**ANDREW L. CARTER, JR., District Judge:**

Plaintiff A.A. commenced this action under the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1415(i)(2)(A),[1] in her individual capacity and on behalf of her son, J.A., seeking reversal of a final administrative decision by the New York State Review Officer ("SRO") affirming a ruling by an Impartial Hearing Officer ("IHO") that Defendant New York City Department of Education ("DOE") offered J.A. a free appropriate public education ("FAPE") for the 2011-12 academic year and denying A.A.'s prayer for an order directing DOE to pay for J.A.'s tuition at the Cooke Center for Learning and Development[2] ("Cooke") for that year. As is common in these cases, Plaintiff moved for summary judgment and Defendant cross-moved for the same based on the extensive factual record reviewed by the SRO.

[1] "Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."
[2] Cooke is a private school that the Commissioner of the New York State Education Department has not approved as an institution with which school districts can contract to provide instruction to students with disabilities. (SRO Decision at 2 n.1) (citing IHO Hr'g Tr. ("Tr.") 202; 8 N.Y. Comp. Codes R. & Regs. §§ 200.1(d), 200.7).

The Court finds that the SRO decision merits deference because it is well-reasoned and supported by the record. Further, DOE's conceded procedural failure to conduct a statutorily required triennial reevaluation of J.A. did not deprive him of a FAPE. The Court expresses sympathy to the parent in this case, who doubtless wanted nothing more than the best for her son. But the IDEA is not so generous. It guarantees a FAPE, not the best education money can buy. Accordingly, and as further explained in this Opinion, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED.

## LEGAL FRAMEWORK

The IDEA was enacted "to ensure that all children with disabilities have available to them a [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living," as well as "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)-(B). "Additionally, the IDEA expresses a strong preference for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment ...." *S.W. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 1754, 2015 WL 1097368, at *1 (S.D.N.Y. Mar. 12, 2015) (citing *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 831 (2d Cir. 2014)) (internal quotation marks omitted). All states receiving federal funds under the statute, including New York, must provide a FAPE for every student with a disability. 20 U.S.C. § 1412(a)(1)(A); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012).

In order to offer a FAPE to every such student, the IDEA requires that at the start of the academic year, "each local educational agency, State educational agency, or other State agency ... shall have in effect, for each child with a disability in the agency's jurisdiction, an

individualized education program" ("IEP"). 20 U.S.C. § 1414(d)(2)(A). The contents of an acceptable IEP are listed in 20 U.S.C. § 1414(d)(1)(A). The IEP must be developed in compliance with the procedures set out in the IDEA, as well as "be reasonably calculated to enable the child to achieve educational benefits." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014) (internal quotation marks omitted).

The State of New York tasks local Committees on Special Education ("CSEs") with formulating IEPs. N.Y. Educ. Law § 4402(1)(b)(1). CSEs consist of one or more of the student's parents, a special education teacher or special education provider of the student, a school psychologist, a school district representative "qualified to provide or administer or supervise special education and … knowledgeable about the general curriculum and the availability of resources of the school district," someone "who can interpret the instructional implications of evaluation results," and others. N.Y. Educ. Law § 4402(1)(b)(1)(a). Parents are afforded the opportunity to appeal the recommendation of a CSE to an IHO in the form of a hearing, and if they disagree with the IHO ruling, they may appeal to a SRO. 20 U.S.C. § 1415(f)-(g); *see also* N.Y. Educ. Law § 4404(2). Once this administrative regime is exhausted, parents are permitted to seek reversal or modification of the final determination of the SRO in state or federal district court. 20 U.S.C. § 1415(i)(2)(A).

Parents who believe their children have been denied a FAPE and who unilaterally place their children in private schools that charge for their attendance may petition the state or federal district court for reimbursement. *T.M.*, 752 F.3d at 152. According to the three-part *Burlington/Carter* test derived from the Supreme Court's precedents, *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374 (1985); *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 12-13, 16 (1993), parents are entitled to

reimbursement if (1) the IEP fails to provide their child with a FAPE, (2) the parents' unilateral private placement was appropriate, and (3) equitable factors favor them. *See M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).

## BACKGROUND[3]

J.A. began attending Cooke in the ninth grade. (IHO Hr'g Tr. ("Tr.") 104:11-19). For that school year, J.A.'s IEP had recommended a 15:1 student-to-teacher ratio in classes at a public school, but J.A.'s mother appealed that determination and reached a settlement with DOE that reimbursed full tuition at Cooke. (*Id.* 103-05). J.A.'s mother appealed his IEPs for the 10th and 11th grades as well, each time settling for reimbursement of full tuition at Cooke without the need to attend a hearing before an IHO. (*Id.* 105). J.A. was 17-years-old and classified with a learning disability[4] when the DOE convened a CSE meeting on June 14, 2011 to prepare his IEP for the 2011-12 academic term, when he would be in the 12th grade. (R. Ex. 1 at 1).

The CSE team included his mother, Cooke Assistant Principal Dr. Francis Tabone, Cooke math teacher Kevin Allard, special education teacher and district representative Jacqueline Giurato,[5] DOE psychologist Nancy Levine, and parent member Gloria Gonsalves. (R. Ex. 1 at 2; IHO Decision at 2). At the time of the CSE meeting, the DOE had not performed a psychoeducational evaluation of J.A. since 2007. (IHO Decision at 2). Rather, the CSE designated its meeting as an annual review. (R. Ex. 1 at 2).

---

[3] The parties neglected to submit a Statement of Material Facts, as required under Local Civil Rule 56.1. However, it is sufficient for the Court to rely on the extensive factual record in deciding this appeal. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).

[4] Plaintiff describes J.A. as exhibiting, "[o]ver the course of his education … significant difficulties with learning, memory, and attention, as well as speech-language deficits." Pl.'s Mem. Supp. Summ. J. 1, ECF No. 13. Defendant, by contrast, depicts J.A. as having "severe speech and language processing issues," but also a "general cognitive functioning … within normal limits" and "social and general adaptive skills [that] were good" enough "that his cohort of friends felt him to be a leader." Def.'s Mem. Supp. Summ. J. and Opp. Pl.'s M. Summ. J. ("Def.'s Mem. Supp. Summ. J.") 2 (internal quotation marks omitted), ECF No. 18.

[5] Although "Giurato" is spelled "Gerrato" in the IHO Decision, the Court adopts the former spelling, as used in the briefs filed by both parties.

The IEP recommended, once again, a special education class in a community school with a student-to-teacher ratio of 15:1 for five academic periods daily, along with related services. (R. Ex. 1 at 1, 13). The CSE considered a student-to-teacher ratio of 12:1, but rejected that option on the basis that it was overly restrictive for J.A.'s needs. (R. Ex. 1 at 14). The related services included speech and language therapy twice weekly for 45 minutes and counseling once weekly for 45 minutes, both in small groups consisting of five students and one teacher. (R. Ex. 3; SRO Decision at 12). In mid-July 2011, DOE sent a notice to J.A.'s mother offering him a placement for the upcoming school year at Pablo Neruda Academy for Architecture & World Studies ("Neruda"). (R. Ex. 8 at 2). As she had done before, J.A.'s mother appealed the IEP on October 18, 2011, seeking full tuition reimbursement for her unilateral decision to place J.A. at Cooke. (IHO Decision at 2). This time, DOE did not settle.

## I. The IHO Decision

The IHO Decision finding that DOE had offered J.A. a FAPE, and denying tuition reimbursement, was rendered on March 15, 2012. (*Id.* at 12-14). It followed an impartial hearing that occurred in four installments—and featured "extensive testimony"—on December 29, 2011, January 4, 2012, February 15, 2012, and February 28, 2012. (*Id.* at 2). At the outset, the decision acknowledged that the most recent psychoeducational evaluation available had been performed on September 25, 2007, when J.A. was 13-years-old. (*Id.*). That evaluation reflected that J.A.'s cognitive ability was in the "[a]verage range overall" and that he had "low average verbal and deficient memory skills." (*Id.*). But the IHO Decision also indicated that a classroom observation had been performed in November 2010, during J.A.'s 11th grade year at Cooke, by Ms. Levine, a school psychologist. (*Id.*). That assessment, made while J.A. was in a social

studies class of 10 students, one teacher, and one teaching assistant, reflected that he was attentive and compliant. (*Id.*).

The IHO noted that during the CSE meeting on June 14, 2011, J.A.'s academic abilities were determined based on testing and teacher estimates. (*Id.*). His reading and writing skills were estimated to be on a fifth grade level, and his overall math skills on a mid-fifth grade level. (*Id.*). Specifically, J.A.'s math instructor indicated that he had passed the math Regents Competency Test ("RCT")[6] and his English Language Arts ("ELA") teacher reported that he performed best at comprehending sentences and short passages, but that he struggled with longer passages. (*Id.* at 2-3). In Speech Therapy, he was focused on developing his pragmatic language skills while also receiving instruction to supplement what he was learning in his ELA course. (*Id.* at 3).

The decision mentioned that after discussing the classroom supports J.A. needed with his teachers, the CSE recommended: "small group instruction, directions repeated, graphic organizers, charts and graph paper, visual and auditory cues, teacher redirection and modeling, scaffolding and [a] multisensory approach." (*Id.*). The IEP consisted of four math goals developed "in conjunction" with J.A.'s math instructor and agreed to by his mother. (*Id.*). Moreover, through consultation with Dr. Tabone and based on J.A.'s functional level, the IEP included three goals for language arts and two goals for written expression. (*Id.*). His speech and language goals were intended to improve pragmatic and language skills necessary to set up an appointment and do well in an interview. (*Id.*). Based upon a review of a Cooke progress report, the CSE developed counseling goals aimed at getting J.A. to use appropriate language and to improve his self-awareness, self-advocacy, and attention to task. (*Id.*). There were also two goals in the area of transition planning. (*Id.*). One was for J.A. to engage in community

[6] RCTs are taken in lieu of standard New York State Regents exams. (IHO Decision at 6).

activities that highlighted his interests and strengths in aid of his becoming independent as he transitioned to life after high school. (*Id.* at 3-4). Another goal was for J.A. to identify vocational options and learn about the job search. (*Id.* at 4). Cooke instructors and J.A.'s mother participated in the development of these goals as well. (*Id.*). To implement them, the IEP dictated that J.A. would participate in a transition program combining academic and vocational training, and that he would integrate into the community through volunteerism. (*Id.*). His curriculum would also include "personal money management skills, travel training, and household maintenance skills." (*Id.*).

The opinion discussed that the IEP called for a special class in a community school providing a student-to-teacher ratio of 15:1 for five class periods each day, with the related services of speech and language therapy twice weekly and counseling once weekly, in 45-minute sessions and in a group of five students. (*Id.* at 3). The 15:1 ratio in a special class was justified on the basis that J.A. needed the support of a small class ratio with a special education teacher and peers with similar academic functioning. (*Id.*). The decision further indicated that the related services component was based upon the recommendations of Cooke. (*Id.*).

The IHO indicated that on July 14, 2010, J.A. was offered a placement at Neruda, and that on August 9, 2011, the attorney for A.A. wrote to the CSE rejecting the 15:1 program as inappropriate and stating that A.A. was unable to observe the recommended program at Neruda in action prior to the beginning of the 2011-12 school year. (*Id.* at 4). As a result, the letter explained, A.A. would re-enroll her son at Cooke for the upcoming school year and seek reimbursement. (*Id.*). By August 2011, A.A. signed a contract re-enrolling her son at Cooke for the year; tuition was $48,000, of which A.A. paid no portion. (*Id.*). A.A. testified during the impartial hearing that her family's annual income was $38,000, such that she could not afford to

front the money for tuition to be reimbursed later. (*Id.*). On September 23, 2011, after A.A. had visited Neruda, her attorney wrote another letter to the CSE stating that the core classes there were collaborative team teaching courses, which were inconsistent with the IEP. (*Id.*).

But, the IHO noted, Carmen Reyes, a certified special education teacher at Neruda who testified during the impartial hearing that she had served in that role for three years, stated that she taught self-contained courses in science, math, and English, with student-to-teacher ratios of 15:1. (*Id.* at 4-5). Ms. Reyes represented that had J.A. enrolled at Neruda, he would have been in her classes in addition to a self-contained social studies class taught by someone named Mr. Russell.[7] (*Id.* at 5). In fact, she said, when the 2011-12 academic year began, there were fewer[8] than 15 students in her courses. (*Id.*). Those students, most of whom were classified as having a learning disability, were 11th and 12th graders functioning on a fourth to sixth grade level, with most of them functioning between a fifth and sixth grade level. (*Id.*). Most of the students took RCTs.

Upon reviewing J.A.'s IEP, Ms. Reyes stated that his needs in the areas of math and language arts were similar to those of the students in her classes, and that she would have been able to accommodate his academic management needs as articulated in his IEP. (*Id.* at 5). By way of explanation, she testified that she provided small group instruction in groups of two to three students assembled according to their functional levels. (*Id.*). Ms. Reyes described how she would implement the IEP goals within her classroom, as well as how J.A.'s related services could have been implemented at Neruda. (*Id.*). She explained that she would have addressed his

---

[7] The IHO Decision noted that for two of the remaining four periods in a day, J.A. would have had a lunch period and an advisory period consisting of approximately 20 students taught by Ms. Reyes and an English instructor, in which students would learn how to navigate life after high school, "including building a resume and interview skills." (*Id.* at 5 n. 2). Additionally, an internship course, offered as an elective, was taught by a special education instructor named Mr. Barnes. (*Id.*). There were two such courses, offered to seniors only, and the course would have been available to J.A. (*Id.*).

[8] Ms. Reyes stated that there were "about 12" students in her classes. (Tr. 42:23).

distractibility by establishing rules for appropriate behavior, permitting him to lead activities, and keeping those activities brief. (*Id.*). In terms of J.A.'s transition goals, Ms. Reyes indicated that Neruda coordinated with the Office of Vocational and Educational Services for Individuals with Disabilities[9] ("VESID") to provide assistance to students with life after high school. (*Id.*). Mr. Russell was the IEP coordinator at Neruda and dealt with coordinating VESID services. (*Id.*). The IHO Decision recounted Ms. Reyes' testimony that she too spoke with students about their post-secondary education interests, and that the students wrote a paper about a career they desired or a place they wished to work. (*Id.* at 5-6). Ms. Reyes stated that in her math class, she discussed money management and savings. (*Id.* at 6). She also discussed with her students how to maintain a clean room. (*Id.*). Further, the students engaged in community service activities during school, including visiting children in hospitals, feeding the homeless, and coat drives. (*Id.*). Sometimes, students traveled by public transportation during school trips and Ms. Reyes explained to them how they would arrive at their destination. (*Id.*).

What is more, Neruda's principal, Sabrina Cook, testified that her school offered an internship program taught by someone named Mr. Barnes. (*Id.* at 6, 10). Mr. Barnes would help students identify their interests during the fall, develop their resume writing skills, and subsequently place them. (*Id.* at 6). Ms. Cook also represented that Neruda employed a full-time social worker and a full-time speech therapist, and that all students requiring counseling and speech therapy were afforded those services. (*Id.*). Additionally, Ms. Cook testified that her school had two special education models: Integrated Co-Teaching ("ICT")[10] and self-contained with a 15:1 student-to-teacher ratio. (*Id.*). She stated that when parents visited the school, she

---

[9] An office of the New York State Education Department dealing with post-secondary education services. It was renamed Adult Career and Continuing Education Services, or ACCES. (SRO Decision at 18 n. 11).
[10] The SRO Decision noted that this term is used interchangeably with "collaborative team teaching," or "CTT." (*Id.* at 4 n.3).

informed them that the school offered both models, but that she did not recall whether she had this conversation with J.A.'s mother when she visited. (*Id.*).

The IHO Decision notes that J.A.'s mother agreed with the IEP's description of his levels of academic functioning and social/emotional performance, as well as its goals for him and characterization of his management needs. (*Id.* at 6-7). She also agreed with the IEP's recommended related services. (*Id.* at 7). However, she, along with Cooke representatives, disagreed with the recommended 15:1 ratio because they felt that J.A. needed a smaller setting with an additional instructor. (*Id.*). His mother testified that he would be unable to focus otherwise. (*Id.*). The decision states that according to A.A., she brought the IEP with her when she visited Neruda accompanied by a Cooke employee, Sally Ord, on September 9, 2011.[11] (*Id.*). There, she met with the principal and the assistant principal, speaking to the principal in particular about J.A.'s learning disability, his needs, and whether Neruda could accommodate those needs. (*Id.*). The principal responded that Neruda was indeed capable of meeting J.A.'s needs, and that he would be placed in a 15:1 classroom with the related services of speech and language therapy and counseling. (*Id.*). A.A. testified that subsequently she was shown a class consisting of 23 students and two instructors. (*Id.*). A.A. acknowledged during her testimony, however, that she was not told that the class would be J.A.'s class. (*Id.*). A.A. further stated that Neruda did not offer work internships, travel training, or instruction in the areas of personal money management and household maintenance. (*Id.*).

A.A. explained that consequently, and because J.A. had made progress at Cooke in various areas, she re-enrolled him there for the 2011-12 year. (*Id.* at 7-8). Cooke Assistant Principal Dr. Tabone, who holds a master's degree in special education and a doctorate in psychology, confirmed J.A.'s progress and opined that Cooke was an appropriate placement for

[11] Ms. Ord testified that the actual date was September 12, 2011. (Tr. 261:8-18).

him. (*Id.* at 8-9). Dr. Tabone testified that when he participated in the CSE meeting, he objected to the 15:1 ratio as inadequate due to the attention J.A. needed to deal with his speech and language processing deficits. (*Id.* at 9). Mr. Allard, who taught J.A. math, also testified that Cooke was an appropriate placement, and that when he participated in the CSE meeting he recommended a 12:1 student-to-teacher ratio on the basis that a 15:1 ratio would not offer enough support. (*Id.* at 9-10). Mr. Allard acknowledged, however, that he helped to formulate J.A.'s IEP, and that he utilized the goals and management needs described therein. (*Id.* at 10). He stated that during the CSE meeting, he was told that J.A.'s grade level was too high to justify placement in a 12:1 classroom. (*Id.*). Beth Sullivan testified that she taught J.A. English and social studies, and echoed the testimony of the other Cooke representatives that the program at that school was appropriate for him because he was "able to get the level of support he require[d]." (*Id.* at 11).

For her part, Ms. Ord testified that she had worked for 17 years in mainstream and special education contexts, and she confirmed that she accompanied A.A. on her visit to Neruda. (*Id.* at 10). She stated that Ms. Cook informed them that the model Neruda offered was an ICT setting in four subject areas, and that there was general education for elective courses. (*Id.*). The IHO Decision pointed out that although Ms. Ord initially testified that the principal told her that Neruda did not offer a 15:1 program, in her rebuttal testimony, Ms. Ord amended her earlier representation to reflect that Ms. Cook had not mentioned a 15:1 self-contained course. (*Id.* at 10, 10 n.5). The decision further observed that in Ms. Ord's written report, she indicated that Neruda offered 15:1 RCT prep courses. (*Id.* at 10 n.5). The IHO highlighted the inconsistency between A.A.'s testimony that Ms. Cook never told her that J.A. would be placed in an ICT classroom with Ms. Ord's testimony that Ms. Cook had told them that he would. (*Id.* at 10). Ms.

Ord testified that she did not feel an ICT classroom would be supportive enough for J.A. (*Id.*). Moreover, she said that Neruda shares its location with eight high schools, producing "a very overwhelming environment" for J.A. (*Id.*). Contrary to the testimony of Neruda representatives, Ms. Ord also described Neruda as not offering travel training or programs aimed at developing independent living skills, including budgeting, home maintenance, and vocational training. (*Id.*). Additionally, Ms. Ord claimed that Neruda informed them that there were no internships available there. (*Id.*).

The IHO Decision began its section titled "Findings of Fact, Conclusions of Law and Order" by acknowledging that the school district bore the burden of demonstrating the appropriateness of the recommended program, and that, as mandated by the IDEA, a student's IEP must be "reasonably calculated to enable the student to receive educational benefits." (*Id.* at 11). The IHO explained that an IEP passing muster should include a description of the student's present levels of academic achievement and functioning, establish annual goals tailored to meet the student's needs, and allow for the use of appropriate special education services. (*Id.* at 12). The IHO noted that J.A.'s mother neither disputed the description of his academic achievement and functioning nor his academic management needs and goals. (*Id.*). Nonetheless, the decision acknowledged, A.A. disagreed with the recommended 15:1 student-to-teacher ratio and claimed that Neruda did not offer to implement J.A.'s IEP or provide adequate transitional services. (*Id.*).

The IHO rejected A.A.'s contentions, using the testimony of Ms. Reyes and Ms. Giurato as the basis for his finding that the recommended program at Neruda was consistent with J.A.'s IEP. (*Id.*). He also found that Neruda could have implemented the IEP. (*Id.*). He noted that Ms. Cook's testimony was consistent with A.A.'s testimony that during her visit to Neruda, Ms. Cook told her that despite being shown a larger class size, J.A. would be placed in a 15:1 self-

contained classroom. (*Id.*). By contrast, the IHO did not credit Ms. Ord's testimony on this point because it was internally inconsistent regarding whether she and A.A. had been told by Ms. Cook during their visit that Neruda did not offer a 15:1 self-contained program. (*Id.*). The IHO referred to Ms. Reyes' testimony regarding Neruda's provision of math, English, science, and social studies courses in a 15:1 self-contained setting with students of similar academic functioning to J.A., as well as the internship course taught by a special education teacher that would have been available to him. (*Id.* at 13). The IHO "attach[ed] little weight to Ms. Ord's" statements claiming a lack of internships and instruction to develop independent living skills at Neruda based on Ms. Reyes' detailed description of the contrary. (*Id.*). The IHO Decision cited Ms. Cook's testimony as supplementing that of Ms. Reyes on this point of accommodating J.A.'s transition needs. (*Id.*). Finally, the decision cited case law for its proposition that to the extent there was deviation from the IEP, it was not substantial. (*Id.*).

## II. The SRO Decision

The SRO Decision affirming the IHO's finding that DOE had offered J.A. a FAPE, and its denial of tuition reimbursement, was issued on June 24, 2014. (SRO Decision at 18). After summarizing the IHO ruling, the 18-page opinion referred to the various arguments Plaintiff offered for reversal. (*Id.* at 5-6). It referred to Plaintiff's arguments that due to the CSE's failure to perform the required triennial evaluation, it lacked adequate evaluative information in formulating J.A.'s IEP, and that even if the evaluative information was adequate, it did not support a 15:1 student-to-teacher ratio in the classroom. (*Id.* at 5). The decision cited Plaintiff's contention that the 15:1 classroom was too large to be sufficiently supportive for J.A.'s needs, and that the IEP should have recommended a 12:1:1 environment instead. (*Id.*). It also

mentioned Plaintiff's theory that Neruda could not have implemented J.A.'s IEP, whereas Cooke was an appropriate placement. (*Id.* at 5-6).

The SRO Decision noted that in response, DOE contended that the evaluative information the CSE utilized was adequate, a new psychoeducational evaluation was unnecessary, and the mother agreed with the description of J.A. in the June 2011 IEP and did not request additional evaluations during the meeting. (*Id.* at 6). According to the decision, DOE further noted "that the CSE relied on the most recent progress report from Cooke dated June 2011 and a 2010 classroom observation, as well as information supplied at the CSE meeting by the parent and two Cooke staff members." (*Id.*). For example, J.A.'s annual math goals were provided by Mr. Allard and his annual reading and written expression goals by Dr. Tabone. (*Id.* at 11). It contended that the evaluative information supported placement in a 15:1 special class, which was the least restrictive environment appropriate, and that Neruda had the capacity to implement the IEP. (*Id.* at 6). Meanwhile, DOE posited, Cooke was too restrictive. (*Id.*).

Addressing Plaintiff's contention that the failure to conduct a triennial evaluation rendered inadequate the evaluative material used during the CSE meeting, the SRO Decision acknowledged that the IHO failed to reach this issue in her decision, but found the hearing record sufficient to reject Plaintiff's argument rather than remand to the IHO for a determination on the point. (*Id.* at 9 n. 5). Citing statutory and regulatory law for the proposition that DOE's (admitted) failure to perform a triennial psychoeducational reevaluation "would lead to a finding that the student did not receive a FAPE in the event that the violation impeded the student's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE … or caused a deprivation of educational benefits," the SRO determined none of those scenarios existed. (*Id.* at 10). The decision noted the various

attendees at the CSE meeting and their respective expertise, in addition to J.A.'s mother and Mr. Allard, his math teacher at Cooke; that the CSE reviewed the September 2007 psychoeducational report, November 2010 classroom observation report, and June 2011 progress report; and that the meeting, which lasted an hour, discussed the evaluative material and the student's needs. (*Id.*).

The SRO proceeded to detail the contents of the IEP, comprehensive in its depiction of J.A.'s functioning levels and needs academically, socially/emotionally, and transitionally. (*Id.* at 10-11). The decision discussed the nature of his math teacher's testimony as to the areas within his knowledge, as well as the testimony of J.A.'s mother, including that she agreed with the characterization of her son's then-present performance levels and goals in the IEP. (*Id.* at 11). It also found the cognitive functioning described in the 2007 psychoeducational evaluation to be consistent with the Cooke assistant principal's estimate of his intellectual ability at the time of the June 2011 CSE meeting. (*Id.*). The SRO determined that the IEP reflected the results of Cooke-administered assessments and information from the June 2011 progress report, all of which had been discussed at the CSE Meeting. (*Id.* at 11-12). Accordingly, the SRO Decision held, the failure of DOE to conduct a triennial psychoeducational reevaluation did not deny J.A. a FAPE, significantly impede A.A.'s ability to participate in the decisionmaking process regarding the provision of a FAPE, or deprive J.A. of educational benefits. (*Id.* at 12).

Moreover, the SRO found that the record supported a 15:1 student-to-teacher ratio. (*Id.*). The SRO Decision responded to Plaintiff's theory that a 15:1 placement in a special class would be insufficiently supportive, which Plaintiff sought to ground in testimony from Cooke representatives to that effect. (*Id.*). The decision took descriptive inventory of the various improvements J.A. had made in recent years in his performance academically, socially/emotionally, and transitionally, as well as his continued limitations. (*Id.* at 12-14). The

decision's observations were based on the June 2011 progress report, November 2010 classroom observation report, and testimony from his math, English, and social studies instructors at Cooke, as well as Ms. Reyes, one of the special education teachers at Neruda. (*Id.*). The decision cited state regulatory law mandating "that the maximum class size for those students whose special education needs consist primarily of the need for specialized instruction which can best be accomplished in a self-contained setting shall not exceed 15 students." (*Id.* at 13) (internal quotation marks omitted). On that point, the SRO referred to testimony from the district's special education teacher that during the CSE meeting, a 12:1:1 special class placement was rejected as too restrictive. (*Id.*). The decision noted that the CSE recommended the 15:1 special class placement because of its small nature and the fact that the students in that environment "were academically functioning on a similar level to him." (*Id.*). Moreover, the IEP specified special services to supplement J.A.'s needs in the form of multiple counseling and speech and language therapy sessions each week, along with various supports to be afforded within the 15:1 program, supports that were shown to be effective based on the testimony of J.A.'s instructors at Cooke and with which J.A.'s mother did not disagree. (*Id.* at 13-14).

Finally, the SRO Decision disposed of Plaintiff's argument that Neruda could not have implemented J.A.'s IEP for the 2011-12 academic term. (*Id.* at 14). The SRO acknowledged A.A.'s assertions that Neruda failed to demonstrate it would have placed J.A. in a 15:1 class for all periods of the school day and that it would have provided the requisite transition services, namely integrated vocational instruction or an internship. (*Id.*). As an initial matter, the SRO further highlighted the fact that A.A.'s contention required him to speculate as to what might have occurred had A.A. placed her son at Neruda rather than unilaterally re-enrolling him at Cooke. (*Id.*). The decision found that, indeed, A.A.'s August 9, 2011 letter to DOE constituted

a rejection of her son's recommended program at Neruda. (*Id.*). The SRO surveyed the jurisprudential landscape within this District and at the Circuit level regarding the appropriateness of determining the adequacy of a recommended placement prior to a student's enrollment in the school, and "continue[d] to find it necessary to depart from those [District] cases" finding that such a predictive exercise was acceptable practice in lieu of strict reliance on the IEP for purposes of assessing the sufficiency of a CSE's recommendation. (*Id.* at 14-15). Moreover, the decision found that it would be inequitable to allow Plaintiff to introduce information regarding Neruda obtained after the CSE meeting and creation of the IEP. (*Id.* at 16). However, the SRO also concluded that even if J.A. had attended Neruda, there was no evidence in the factual record supporting the position that the school would have deviated "in a material or substantial way" from the IEP. (*Id.* 16-17). Due to its finding that Neruda could implement the IEP, the SRO considered it unnecessary to consider the appropriateness of Cooke as a placement. (*Id.* at 18).

## STANDARD OF REVIEW

"Although the parties have styled their submissions as motions for summary judgment, the procedure in IDEA actions is in substance an appeal from an administrative determination, not a summary judgment." *S.W.*, 2015 WL 1097368, at *7 (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005)) (internal quotation marks omitted) (brackets omitted). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal citation omitted) (brackets omitted)

(internal quotation marks omitted). In according due weight, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012) (internal quotation marks omitted). Of course, the factual findings of an SRO or IHO "must be reasoned and supported by the record to warrant deference." *Id.* (internal quotation marks omitted). "Deference is particularly appropriate when ... the state hearing officers' review has been thorough and careful." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *M.H.*, 685 F.3d at 244.

## DISCUSSION

As previously noted, in determining whether an IEP provides a FAPE to a student with a disability, a Court considers (1) whether the IEP was created in compliance with the IDEA's procedural requirements, and (2) whether the program contained in the IEP is reasonably calculated to produce educational benefits for the student. The party appealing an SRO ruling, in this case Plaintiff, bears the burden of demonstrating that a FAPE was not offered. *M.H.*, 685 F.3d at 225 n.3. Although DOE concedes that it did not comply with the procedural requirement that it conduct a reevaluation "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary," 20 U.S.C. § 1414(a)(2)(B)(ii), because Plaintiff has failed to meet its burden in showing that J.A. was denied a FAPE or adequate parental participation at the CSE meeting as a consequence, Plaintiff cannot meet "Prong I" of the three-part *Burlington/Carter* test for reimbursement, foreclosing the need to evaluate the appropriateness of Cooke as a placement and any equitable considerations that may

favor Plaintiff's case. *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000); *see also Burlington*, 471 U.S. at 374.

## I. The SRO Decision was well-reasoned, meriting deference

It guides the analysis of the Court to first observe that there is no basis to find that the SRO Decision affirming the IHO's denial of tuition reimbursement was not well-reasoned. *See supra* The SRO Decision. As DOE correctly points out, "Plaintiff's contention that the [SRO] opinion was poorly reasoned consists for the most part of arguing that the SRO reached the wrong conclusions rather than that his reasoning was insufficient." Def.'s Mem. Supp. Summ. J. and Opp. Pl.'s M. Summ. J. ("Def.'s Mem. Supp. Summ. J.") 9-10, ECF No. 18.

Plaintiff's chief complaint in this connection is that the evidence did not support the IEP's recommendation of a 15:1 student-to-teacher ratio in a special class for J.A. As support, Plaintiff proffers that the IHO, and apparently the SRO on review of the factual record, were misled by the testimony of Ms. Giurato, a special education instructor and district representative present at the CSE meeting, that "the team," rather than just certain members of the CSE team, "felt that there really wasn't a need to" conduct a triennial psychoeducational reevaluation. (Tr. 193:15-16). But that scenario is implausible because as recorded on the very next page of the transcript to which Plaintiff cites, Ms. Giurato explained: "I don't remember if [J.A.'s mother, Dr. Tabone, or Mr. Allard] said anything. The general policy of the school is to of course object, but I don't remember if they specifically objected at this meeting." (Tr. 194:6-9). Moreover, even if, as Plaintiff claims, there was no discussion during the CSE meeting about the merits of conducting a triennial reevaluation, there is also no evidence indicating that anyone present during the meeting felt the evaluative material the CSE used was deficient. Indeed, the SRO Decision notes that the hour-long CSE meeting discussed the metrics on which the IEP was

based, and that J.A.'s mother agreed with the IEP's depiction of J.A.'s performance levels and goals. The SRO also described the instrumental role Cooke representatives played in the development of the IEP, to the extent of producing then-current information regarding J.A.'s performance levels and supplying annual goals.

Plaintiff next submits that the June 2011 progress report, November 2010 classroom observation, IEP from the 2010-11 school year, reports from Cooke representatives at the CSE meeting, and November 2007 psychoeducational evaluation collectively indicated that a 15:1 ratio was inadequate. Plaintiff seizes on the SRO Decision's use of the classroom observation's description of J.A. as "typically attentive and compliant" as reasonable support for his ability to make educational gains in a 15:1 environment, arguing that it "failed to acknowledge that it recounts J.A.'s functioning in a setting with a markedly different staffing ratio—a Cooke class with ten students and 'one teacher, and one assistant teacher'—and that the observation lasted for only one period." Pl.'s Mem. Supp. Summ. J. 14 (citing SRO Decision at 12; R. Ex. 5), ECF No. 13. Plaintiff then cherry-picks other details from the evaluative material demonstrating certain of J.A.'s difficulties and needs in his program of roughly 10 students and two teachers at Cooke in support of her theory that the proper interpretation from that evidence is J.A. was only capable of succeeding in a classroom smaller than 15:1. *Id.* 14-15. To side with Plaintiff on this point would be to venture into the weeds of educational policy, which the Court should not and will not do. *See A.C.*, 553 F.3d at 171; *see also D.J. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 7009, 2013 U.S. Dist. Lexis 115666, at *15 (S.D.N.Y. Aug. 15, 2013) ("class size and student-teacher ratios involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges") (internal quotation marks omitted).

Surely, the reasoning of the SRO, who generally has more expertise on questions of educational methodology than the federal courts, is supported by the evidence in the factual record. As described *supra* The SRO Decision, the ruling discussed with specificity the array of improvements J.A. had made in recent years academically, socially/emotionally, and transitionally. It also took stock of his then-extant limitations. The factual findings expressly relied on the June 2011 progress report, November 2010 classroom observation report, November 2007 psychoeducational evaluation, and testimony from his teachers in three courses at Cooke, as well as Ms. Reyes, who taught special education at J.A.'s recommended placement, Neruda. The decision noted Ms. Giurato's testimony that the 15:1 self-contained special classroom environment was one in which students of similar academic functioning were enrolled; that Neruda could provide for J.A.'s unique needs in the form of related services like small group counseling and speech and language therapy sessions held multiple times a week; and that the IEP provided for other supports with proven effectiveness per the testimony of J.A.'s teachers at Cooke, to which J.A.'s mother did not take exception.

Plaintiff makes much of the fact that representatives of the school where J.A. had been enrolled for several years opined that 15:1 was too large, but there was nothing unsound about the SRO's independent review of the factual record leading him to conclude otherwise. While the view of an instructor who has previously taught a student should be—and in this case, was—seriously considered during IEP development, it is not endowed with talismanic power. *See, e.g., N.S. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 7819, 2014 U.S. Dist. LEXIS 83921, at *7 n.6 (S.D.N.Y. June 16, 2014) ("it cannot be ignored that [the school] has a financial interest in touting the value of its own program"); *see also* (Tr. 194:7-8) (Ms. Giurato testifying that "[t]he general policy of the school is to of course object"). Deference is especially appropriate here,

where the SRO Decision agreed with the ruling of the IHO. *See A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013); *see also A.H. ex rel. J.H. v. Dep't of Educ. of City of N.Y.*, 394 F. App'x 718, 719-20 (2d Cir. 2010) (reversing where district court "failed to accord sufficient deference to the decisions of the" SRO and IHO, "both of whom concluded that the IEP offered [the student] a free appropriate education"). Moreover, Plaintiff's contention that the SRO Decision did not explicitly address the testimony of Dr. Tabone and Mr. Allard that they disputed the adequacy of the 15:1 program at the CSE meeting is at best unconvincing. It is answer enough that the SRO, as had the IHO before him, acknowledged the position of the Cooke representatives and J.A.'s mother before explaining why he disagreed based on his view of the evidence.

Finally, Plaintiff asserts that the SRO Decision "erroneously relied on Ms. Giurato's testimony that placing J.A. in a 12:1:1 class was 'too restrictive' for J.A. and would be contrary to 'appropriate LRE considerations.'" Pl.'s Mem. Supp. Summ. J. 17. Plaintiff correctly describes the LRE analysis as occurring in the context of educating students with children who are not disabled. 20 U.S.C. § 1412(a)(5)(A).[12] The argument goes that it was improper for Ms. Giurato to base her decision to forgo a 12:1:1 class in favor of a 15:1 setting on LRE concerns when both of those classrooms would consist entirely of students with disabilities, making one no more restrictive than the other. DOE responds by noting that Ms. Giurato's full quote is: "We considered a *District 75* program, possibly a 12:1:1, but that would have been too restrictive. The students in a 12:1:1 program in District 75 are generally functioning on a 3rd grade level or below, and so academically he is too high functioning for a 12:1:1 program." (Tr. 185:11-17)

[12] "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

(emphasis added). DOE elaborates that "District 75 refers to specialized schools—ones in which there are no nondisabled students. Specialized schools are, in turn, recognized as more restrictive than community schools [like Neruda], whatever the class ratio, because there is no opportunity for disabled students in those schools to 'mainstream' during non-academic activities." Def.'s Mem. Supp. Summ. J. 12-13.

DOE's clarification is unsettling. As Plaintiff points out, "A district 'cannot avoid the least restrictive environment requirement just by deciding not to operate certain types of educational environments; instead, it must provide a continuum of alternative placements that meet the needs of the disabled children that it serves.'" Pl.'s Mem. Opp. Def.'s M. Summ. J. and Reply to Def.'s Mem. Opp. Pl.'s M. Summ. J. 10-11 (citing *T.M.*, 752 F.3d at 165) (brackets omitted), ECF No. 23. In other words, if the 12:1:1 program would have been appropriate for J.A. but for concerns about his ability to interact with nondisabled students outside that 12:1:1 special classroom setting, the 15:1 recommendation might be problematic in light of DOE's apparent ability to accommodate a 12:1:1 special classroom setting within the community school context. *See E.A.M. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 3730, 2012 U.S. Dist. LEXIS 143266, at *7-9 (S.D.N.Y. Sept. 29, 2012) (IEP recommended a 12:1:1 special class in a community school). Nevertheless, and as the SRO Decision also observed, Ms. Giurato offered a permissible, substantive basis for nixing the 12:1:1 option: J.A. was too high functioning academically compared to the students in that program, whereas he functioned similarly to the students in the 15:1 setting. *See J.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2184, 2013 U.S. Dist. LEXIS 63178, at *6 (S.D.N.Y. Apr. 24, 2013) ("New York requires its school districts to place students with disabilities in classes with peers of similar individual needs") (quoting 8 N.Y. Comp. Codes R. & Regs. § 200.6(h)(2)-(3)) (internal quotation marks omitted). Dispositively,

there is no indication in the record that the recommendation of a 15:1 special class in a community school was inadequate for J.A. given his progress at Cooke and the related services and supports also included in the IEP. Rather, as discussed *infra*, a preponderance of the evidence supports a finding that the 15:1 program was reasonably calculated to allow J.A. to achieve educational benefits.

Plaintiff's remaining arguments for why the Court should find that the SRO Decision was not well-reasoned are without merit.

## II. The failure to conduct a triennial reevaluation was not fatal

A procedural error does not result in the denial of a FAPE unless it has "impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits." *R.E.*, 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (internal quotation marks omitted) (brackets omitted). With due deference to the SRO Decision, a preponderance of the evidence in the factual record supports the conclusion that the June 2011 IEP offered J.A. a FAPE for that upcoming school year. During the CSE meeting, neither J.A.'s mother nor the Cooke representatives disputed the IEP's characterization of J.A.'s needs or the goals set forth in that document; rather, they were integral in identifying them. Additionally, Plaintiff concedes that the IEP reflected accurate information about J.A.'s performance on Cooke-administered examinations. The SRO Decision, in finding that the IEP afforded J.A. a FAPE like the IHO before him, grounded his conclusions in various metrics and assessments of J.A.'s performance levels, needs, and limitations that were up-to-date at the time of the CSE meeting, including the June 2011 progress report, November 2010 classroom observation report, and reports from Cooke representatives. The SRO Decision

also considered subsequent testimony from J.A.'s math, English, and social studies instructors at Cooke, as well as Ms. Reyes, one of the special education teachers at Neruda.

The IEP was comprehensive in that it addressed J.A.'s academics, social/emotional development, and transition to life after high school, and the SRO acted reasonably in crediting the testimony of Ms. Reyes that, based on her experience teaching 15:1 self-contained special classes at Neruda and her review of the IEP, the recommended program would produce educational gains for J.A. That program, aside from the 15:1 special class size, included related services and proven supports. Indeed, as described *supra* The IHO Decision, Ms. Reyes testified regarding the specific ways in which she, as J.A.'s would-be instructor in science, math, and English, as well as Neruda as an institution, would address all of his needs and goals as stated in the IEP.

Plaintiff posits that the SRO Decision committed error by not holding DOE to the burden of proving that the failure to conduct a triennial reevaluation did not significantly impede the participation of J.A.'s mother in the decisionmaking process. "Regardless of who has the burden of proof, it is clear that the DOE prevailed at the SRO level. Additionally, as the case law makes clear, the Court must defer to the SRO. It thus is incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal." *W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.C.*, 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010). Here, there is no indication in the record that the failure to conduct a triennial reevaluation deprived A.A. of evaluative material so critical and insufficiently substituted at the CSE meeting that she was significantly hindered in her ability to advocate for J.A. In fact, the evidence reveals the contrary. In his expertise, as had the IHO and CSE before him, the SRO found "that the information available to the June 2011 CSE was sufficiently

comprehensive to identify all of the student's special education and related services needs." (SRO Decision at 12). Certainly, the failure to conduct a triennial reevaluation was not so disarming that it prevented J.A.'s mother and the Cooke representatives from disputing the adequacy of a 15:1 student-to-teacher ratio in favor of a smaller one at the CSE meeting, a position considered and rejected by the CSE, IHO, SRO, and now the Court. Tellingly, Plaintiff refers to the same evaluative material claimed to be fatally deficient as strong evidence for her position that J.A. needed a more intimate setting.

The Court finds that J.A. was not deprived of educational benefits for the same reasons it finds he was offered a FAPE. "Under the IDEA, for a child's IEP to be adequate, it must be likely to produce progress, not regression, and ... afford the student with an opportunity greater than mere trivial advancement. However, it need not ... furnish every special service necessary to maximize each handicapped child's potential." *M.H.*, 685 F.3d at 224 (internal citations omitted) (internal quotation marks omitted) (brackets omitted) (ellipses in original). The June 2011 IEP met this standard. Accordingly, Plaintiff's remaining arguments alleging fatal procedural errors are without merit.

## III. Plaintiff's theory that Neruda could not implement the IEP is invalid

Plaintiff contends that the SRO improperly rejected as speculative her theory that Neruda could not implement J.A.'s IEP during the 2011-12 academic term. It is well-established that if Plaintiff had enrolled J.A. at Neruda for the 2011-12 school year, only to discover during the course of the year that Neruda was incapable or unwilling to accommodate the requirements contained in his IEP, she would have a viable claim for tuition reimbursement for her unilateral placement of J.A. at a school that did effectively implement his recommended program. *See F.L.*

*ex rel. F.L. v. N.Y.C. Dep't of Educ.*, 553 F. App'x 2, 9 (2d Cir. 2014). But that is not what happened. As the parties acknowledge, and as Judge Stein of this Court has observed:

> District courts have reached differing conclusions as to their role in evaluating the ability of schools to comply with an IEP in cases where parents unilaterally choose to place their child in a private school prior to the implementation of the IEP. Some courts have read *R.E.* broadly enough to exclude all prospective challenges to a child's proposed placement. Other courts have interpreted *R.E.* to provide for a narrow exception where the proposed placement was "factually incapable" of implementing the IEP or the proposed placement told the parent of its "plans to contravene the IEP."

*S.W.*, 2015 WL 1097368, at *14-15 (internal citation omitted). *See also N.S.*, 2014 WL 2722967, at *12 ("courts have reached dramatically different interpretations of their role in evaluating the ability of a school to comply with an IEP in cases when parents choose not to avail themselves of the placement").

On these facts, the Court need not rule one way or the other, because Plaintiff has failed to satisfy even the limited exception through demonstrating that Neruda was incapable of implementing J.A.'s IEP or intended to violate its terms. *See S.W.*, 2015 WL 1097368, at *15. A preponderance of the evidence in the factual record corroborates the SRO's finding that Neruda was capable of implementing the IEP. As previously described, Ms. Reyes and Ms. Cook testified in detail regarding how Neruda would have accomplished this. Plaintiff complains that when she visited Neruda, she was shown an ICT class model rather than the self-contained class recommended in the IEP. But she conceded in her testimony that she was never told during her visit that Neruda did not also offer the self-contained model. Ms. Ord, who accompanied A.A., eventually changed her testimony to reflect that she too could not remember ever being told such a thing. Moreover, Plaintiff testified that prior to being shown the ICT class, Neruda's principal told her that if J.A. enrolled, he would be placed in a 15:1 self-contained environment.

In addition, Plaintiff claims that Neruda was incapable of meeting the IEP's recommended program of a 15:1 environment for "all" periods per week. (R. Ex. 1 at 13). The Court finds that the IEP actually recommended a 15:1 special class only for "academic periods," specifically "5 periods per day," as is clarified on the same page Plaintiff cites. (*Id.*). As the SRO Decision noted, Ms. Reyes testified that in terms of academic courses, Neruda would have offered J.A. a 15:1 student-to-teacher ratio in math, English, science, and social studies. She also testified that, aside from lunch and a student advisory period, in J.A.'s remaining, "non-academic" classes, such as elective courses in art, music, architecture, and urban studies, he would be in classes of approximately 20 students or fewer, taught by one or two instructors. (Tr. 82-86; *see also* SRO Decision at 17, 17 n. 9). Additionally, the IHO mentioned that J.A. would have been able to take an internship course taught by Mr. Barnes, a special education instructor. The SRO Decision did not acknowledge the implication from this testimony that J.A. might have only been offered four, rather than five, "academic" courses that were 15:1. Regardless, the Court's independent review of the record, as well as its duty to accord deference to the SRO's expertise, leads it to agree with the SRO that in light of the various aforementioned offerings, there would have been no material or substantial deviation from the IEP. *See A.P. v. Woodstock Bd. of Educ.*, 370 F. App'x 202, 205 (2d Cir. 2010); *see also Y.F. v. N.Y.C. Dep't of Educ.*, 2015 WL 4622500, at *6 (S.D.N.Y. July 31, 2015).

Because Plaintiff cannot meet "Prong I" of the *Burlington/Carter* test for reimbursement, there is no need to examine the appropriateness of Cooke or the equities surrounding her unilateral re-enrollment of J.A. at that school.

## CONCLUSION

For the reasons stated in this Opinion, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate ECF Nos. 12 and 17 and to close this case.

**SO ORDERED.**

**Dated:** **New York, New York**
**August 24, 2015**

**ANDREW L. CARTER, JR.**
**United States District Judge**